# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MARIA GUZMAN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 CV 6617 |
| | ) | Judge Blanche M. Manning |
| CITY OF CHICAGO, MARVIN | ) | |
| BONNSTETTER, and DANILO ROJAS, | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

With just a few weeks left in her pregnancy, plaintiff Maria Guzman rested in bed at her apartment the morning of June 14, 2005. Little did she know that outside lurked Chicago police officers and FBI agents. The officers and agents were preparing to storm her apartment. The officers thought it was a single-family residence where a drug suspect had lived. What they did not realize was that the building actually contained multiple units, and their suspect had not lived there for years.

As police started their search, they knocked on a front door. Guzman heard the knocks and went to open the door, but before she could get dressed officers broke through her door with a crowbar. She hit the floor while officers searched her apartment, which occupied the second floor of the building. When the search ended the officers freed Guzman, but rather than returning to bed, she sought medical attention at a hospital emergency room for stomach pains. The hospital admitted her, treated her for false labor, and released her the following day.

Guzman has sued the city of Chicago and two of its police officers for violating her constitutional rights. *See* 42 U.S.C. § 1983. Specifically, she has sued them for illegal search (Count I), false arrest (Count II), and use of excessive force (Count III). She has also included

claims under state law for battery (Count IV), false arrest (Count V), willful and wanton conduct (Count VI), respondeat superior (Count VII), and indemnification (Count VIII). The defendants have filed a joint motion for summary judgment on all of her claims. In response, Guzman has abandoned her constitutional claim for excessive force (Count III) and her state law claims for battery (Count IV) and false arrest (Count V), but disputes that the defendants are entitled to summary judgment on her remaining claims. For the reasons that follow, the court grants the motion for summary judgment as to Counts I, II, III, IV and V, and declines to exercise its supplemental jurisdiction over the remaining state-law claims.

## FACTS

Defendant Marvin Bonnstetter is an officer with the Chicago Police Department who investigates gangs and gang-related crimes. During the course of an unrelated investigation, Bonnstetter met an inmate at the Cook County jail who expressed an interest in becoming a police informant upon his release from jail. Months later and after being released from jail, the informant contacted Bonnstetter to schedule a meeting at police headquarters. During the meeting, the informant told Bonnstetter and FBI agent James McDonald about various Chicago gangs and gang activity.

Among the alleged gang members the informant discussed with Bonnstetter was Ruben Estrada. The informant told Bonnstetter that he had recently seen Estrada at a single-family residence at 1536 W. Walton and that Estrada had displayed a pistol. The informant also described watching Estrada enter the residence through one door and exit through another. Much of what the informant told Bonnstetter about Chicago gangs confirmed information Bonnstetter already knew, and therefore Bonnstetter considered the informant to be credible. He further

tested the informant's credibility by showing him numerous pictures of gang members they had discussed, including Estrada. The informant correctly identified the picture of Estrada.

Following the meeting with Bonnstetter and McDonald, the informant accompanied McDonald to the Walton building and confirmed that it was the building where he saw Estrada with the pistol. McDonald also noticed a real estate sign near a front window, which left him with the impression that someone was running a real estate business out of the home. Meanwhile, Bonnstetter ran the address of the Walton building through a police database, which listed Ruben Estrada as the resident of that building.

Bonnstetter also ran Estrada's criminal record and noted that Estrada had listed 1536 W. Walton as his address on eight occasions between April 1997 and May 2001. However, during that time he also listed other addresses, including 1636 W. Walton and 1538 W. Walton. Between March 2002 and April 2005 he listed other addresses, including 2943 N. Ridgeway and 1515 W. Cortez.

In addition to the information obtained from the confidential informant, Bonnstetter received additional information about Estrada from a fellow officer. The fellow officer told Bonnstetter about information he received from a different informant that "a man named Ruben [who] had been involved in narcotics activity at 1536 W. Walton and possible gunfire at that location."

Armed with all of this information, Bonnstetter completed a complaint seeking issuance of a search warrant including a warrant affidavit. An attorney from the state's attorney's office and a watch commander from the Chicago police department both reviewed the complaint, which Bonnstetter then presented to a state court judge. The informant accompanied Bonnstetter to

answer any questions or address any concerns the judge might have had. Based on the complaint and Bonnstetter's affidavit, the judge signed the search warrant. The warrant commanded the search of "[a] male white Hispanic, named Ruben J. Estrada" and the premises of "1536 W. Walton, Chicago, Cook County, ILL. a single family residence," and instructed Chicago police to seize a "handgun and any proof of residency…that shows proof of residency or control of this house."

Contrary to the information Bonnstetter obtained from the informant, the building at 1536 W. Walton was not a single-family residence, but rather contained two residential units and one commercial unit. The commercial unit was occupied by a real estate office in the front of the first floor, while the rear of the first floor contained one of the residential apartments. The second residential apartment was located on the second floor of the building and was where Guzman lived.

On the morning of June 11, 2005, a team of about 11 Chicago police officers and 7 FBI agents executed the search warrant for the Walton building. Bonnstetter rang the doorbell several times at a door on the front of the house and entered the unlocked door after receiving no answer. Bonnstetter then went upstairs, found a locked door, announced his presence and, when no one responded, he forced his way through using a crowbar. Other police officers followed Bonnstetter into the apartment and commenced their search.

The parties do not agree on what occurred inside Guzman's apartment. According to Guzman, police stormed her apartment with guns drawn. The officers ordered her to the floor, where defendant Danilo Rojas pushed down on her back in order to keep her on the floor. Guzman attempted to reposition herself to protect her unborn child, but each time she tried Rojas

applied more pressure to her back which prevented her from moving. After about 10 minutes, Rojas eventually let her get up from the floor to sit in a chair.

The defendants tell a much different story. While they agree that officers ordered Guzman to the floor, they deny that Rojas kept her on the ground by pushing her because they assert he did not enter the apartment until Guzman was already seated.

The entire search lasted about a half hour. As the officers left, Guzman's husband returned home and Guzman told him that something was wrong with her stomach. Worried for their unborn child, Guzman's husband took her first to her obstetrician and then to the hospital. She was admitted, diagnosed as suffering from false labor, and released the following day. Two months later, she gave birth to a healthy baby boy.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Moreover, a court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *See Valenti*, 970 F.2d at 365; *see also Anderson*, 477 U.S. at 248.

Normally, then, resolution of the motion for summary judgment turns on whether the nonmoving party has shown that a dispute about a genuine material fact exists that must be

resolved by a jury. *See Anderson*, 477 U.S. at 248. However, the arguments set forth in support of and in opposition to the defendants' motion for summary judgment focus primarily on whether the warrant to search the building where Guzman lived was supported by probable cause, and whether the defendants' conduct upon realizing that the warrant mistakenly described the building was objectively reasonable. The facts material to those inquiries are largely undisputed, and therefore the validity of the warrant and search are questions of law for the court to resolve. *See Garrison v. Maryland*, 480 U.S. 79, 88 (1987) (determining as a matter of law that officers' limitation of their search upon discovering that warrant was overbroad was objectively reasonable); *United States v. Ellis*, 499 F.3d 686, 688 (7th Cir. 2005) ("when 'what happened' questions are not at issue, the ultimate resolution of whether probable cause existed is a question of law") (internal quotations and citation omitted).

## DISCUSSION

### I.     Illegal Search (Count I)

To be constitutional under the Fourth Amendment, a search must be (1) based upon a valid warrant, probable cause or exigent circumstances, and (2) executed in a reasonable manner in accordance with the terms of the warrant. *See Garrison*, 480 U.S. at 84. Guzman contends both that the warrant was invalid and that the officers acted unreasonably when executing it, while the defendants argue that both the warrant and the search were proper. The court will first address the arguments concerning the validity of the warrant, and then focus on the arguments about the officers' execution of the warrant.

### A.        Validity of the Warrant:  Probable Cause & Particularity

The Fourth Amendment states that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched."  U.S. CONST. amend. IV.   Thus, in order to be valid a warrant must (1) be supported by probable cause, and (2) describe with particularity what may be searched.

### 1.        Probable Cause

Probable cause for a search warrant exists if the facts and circumstances that are known are sufficient to lead a reasonably prudent person to believe that contraband or other evidence of a crime will be found in the place to be searched.  *See United States v. Lake*, 500 F.3d 629, 632 (7th Cir. 2007).  Whether probable cause supported the issuance of the warrant depends upon the information disclosed by investigating officers to the judge issuing the warrant, or information the investigating officers had a duty to discover and disclose.  *See Garrison*, 480 U.S. at 85. Thus, the existence of probable cause is gauged at the time the warrant issued and is unaffected by facts learned later.  *Id.*  ("[t]hose items of evidence which emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued.").

Guzman alleges that the warrant to search her apartment was invalid because Bonnstetter failed to disclose, or failed to discover and disclose, information which would have negated the existence of probable to issue the warrant.  Specifically, Guzman argues that Bonnstetter did not adequately corroborate the information he received from the confidential informant, most notably whether the Walton building was a single-family home, and did not provide the magistrate judge with any information about the reliability of the confidential informant.

As noted earlier, Bonnstetter took several steps to attempt to corroborate the information he received from the confidential informant about Estrada and the Walton building before obtaining the search warrant.  Specifically, he showed the confidential informant a picture of Estrada to confirm that he was the person the confidential informant saw with a gun at the Walton building.  He also sent the confidential informant to the Walton building with FBI agent McDonald to verify that the building was the same one where he saw Estrada.  Bonnstetter also ran the address of the Walton building through a police database, which confirmed that the address was the same as the one on file for Estrada.

Guzman contends that Bonnstetter's efforts were insufficient.  However, his investigation was not unlike the investigation that officers conducted in *United States v. White*, 416 F.3d 634 (7th Cir. 2005).  In *White*, a confidential informant told police about crack he had purchased from a dealer at what he purported to be a single family residence.  *Id.* at 635.  Officers attempted to corroborate the information they received from the informant before obtaining a search warrant by showing him a picture of the reported dealer to confirm the dealer's identity, running the dealer's name through a police database to confirm that the address the informant gave to police was an address the dealer had used, and examining the exterior of the building at the address the informant had given them to confirm that it was a single family residence.  *Id.* at 638-39. Although the building turned out to be a multi-unit building with a barbershop on the first floor, the court found that the steps the officers had taken to corroborate the informant's information were reasonable and thus concluded that the warrant was valid.  *Id.* at 640.

The investigative steps that Bonnstetter took were similar to the steps taken in *White*:  (1) showing pictures to the informant to confirm the suspect's identity; (2) examining the exterior of

the building to confirm that it was a single-family residence; and (3) confirming that the address obtained from the informant was one used by the suspect. Nevertheless, Guzman contends Bonnstetter should have done more. For instance, Guzman argues that Bonnstetter should have examined the exterior of the building himself rather than sent FBI agent McDonald to do so. Guzman also argues that Bonnstetter should have called the real estate agency whose sign appeared on the building, or should have checked with the Cook County assessor's website to investigate whether the building was a single-family residence.

With the benefit of hindsight, the steps that Guzman suggests might have been helpful. However, Guzman has presented no authority that they were legally required. *See Jacobs v. City of Chicago,* 215 F.3d 758, 768 (7th Cir. 2000) ("we do not judge the validity of a warrant '[w]ith the benefit of hindsight'") (quoting *Garrison*, 480 U.S. at 85). This is especially true in light of the fact that the defendants conducted a pre-search inquiry and everything known to them at the time indicated that the home was a single-family residence.

Nevertheless, Guzman contends that a number of features of the building should have alerted the officers to the fact that the Walton building was not a single-family residence. For instance, a real estate sign and property listings can be seen on the front of the building. The building also has two separate front entrances, each with its own mailbox. According to Guzman, the real estate signs and separate entrances and mailboxes should have alerted officers to the need to conduct more investigation.

In support, she cites *United States v. Andrews*, 713 F. Supp. 1319, 1320 (D. Minn. 1989), where officers obtained a warrant to search a single-family home, but the building turned out to contain two separate apartments and their suspect lived on the second floor. Officers searched

both apartments, and the resident of the first floor unit moved to suppress the evidence that officers recovered during the search of his apartment (the nature of the evidence is not discussed). *Id.* at 1320-21. The court determined that the warrant was invalid because, during their pre-search investigation to corroborate information obtained from a confidential informant, officers had turned a blind eye toward evidence that the building was not a single-family residence. *Id.* at 1321. Specifically, the officers had ignored their observation of an intercom system typically used only in multi-unit buildings, as well as a letter they found in the trash behind the home that was addressed to their suspect on "Flr 2." *Id.*

The instant situation is distinguishable from the one presented in *Andrews*, where the officers had evidence actually in their possession that suggested the building was not a single-family residence. In contrast, Guzman has not identified any evidence that was in the officers' possession that the Walton building was not a single-family residence. Even if the officers had seen both mailboxes on the front of the building (which Bonnstetter denies), the mailboxes do not undermine officers' conclusion that, as FBI agent McDonald put it, "somebody was doing real estate out of their house." (R. 119 ¶ 31.) *See also United States v. White*, 416 F.3d 634, 639-40 (7th Cir. 2005) (existence of barbershop sign in first-floor window did not, by itself, undermine officers' belief that building was a single-family home).

Guzman also argues that Bonnstetter failed to present evidence to the magistrate judge on the confidential informant's reliability. Specifically, she contends that Bonnstetter failed to advise the magistrate judge that police had never before received information from this informant or made an arrest based on information from the informant, and that the informant was incarcerated when Bonnstetter first met him. The court agrees with Magistrate Judge Cole who,

in denying Guzman's motion to compel the release of the informant's name, noted that "it would surely appear that the police were not precluded from relying on [the informant to establish probable cause] merely because he was a 'first time' informant." *Guzman v. City of Chicago*, 242 F.R.D. 443, 448 (N.D. Ill. 2007) (noting that in criminal cases, the uncorroborated testimony of perjurers, convicted felons, and accomplices may establish guilt beyond a reasonable doubt, a standard much higher than the relatively lax probable cause standard).

Moreover, Bonnstetter did investigate the informant's reliability by attempting to corroborate the information obtained from the informant. *See also United States v. Washburn*, 383 F.3d 638, 642 (7th Cir. 2004) (statements of first-time informant may establish probable cause where officers corroborated informant's statements). And the confidential informant was present under oath before the magistrate judge when the warrant issued:

> when a [confidential informant] accompanies the officer and is available to give testimony before the judge issuing the warrant, his presence adds to the reliability of the information used to obtain the warrant, because it provides the judge with an opportunity to assess the informant's credibility and allay any concerns he might have had about the veracity of the informant's statements.

*United States v. Lloyd*, 71 F. 3d 1256, 1263 (7th Cir. 1995) (internal quotation and citation omitted).

In any event, Guzman has failed to cite any authority that would require officers to present to a magistrate judge detailed information about an informant such as whether the informant had provided information in the past and whether the police had made arrests based upon the informant's information, and therefore the argument has been forfeited. *See Jarrad v. CDI Telecommunications, Inc.*, 408 F.3d 905, 916 (7th Cir. 2005) (arguments unsupported by citations to authority are forfeited).

For these reasons, Guzman has not shown that the officers obtained the search warrant despite the absence of probable cause, and therefore has not shown that the warrant was invalid.

### 2.       Particularity

Guzman included in her brief opposing summary judgment a section discussing the requirement that a search warrant describe the place to be searched with particularity. However, she never argues that the warrant to search her home lacked particularity. The court will not craft arguments for her, and therefore any argument that the warrant lacked particularity has been forfeited. *See Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) (arguments not raised are forfeited).

In any event, any argument that the warrant lacked particularity would be meritless. As discussed above, the warrant that issued was consistent with the information that Bonnstetter and McDonald obtained during their reasonable investigation and the conclusions they reached after that investigation. Although during their execution of the warrant they discovered facts inconsistent with the warrant, those inconsistencies did not retroactively invalidate the warrant. *See Garrison*, 480 U.S. at 85 ("the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant.").

### B.       Execution of the Warrant

Next, Guzman argues that the defendants' search of her home was illegal based upon the manner in which they executed the warrant. Specifically, Guzman argues that the defendants were required to stop their search once it became apparent that the warrant contained a fatal defect—namely, that the warrant described a single family residence but the building contained both residential and commercial space.

In support, Guzman cites *Garrison*, where the Supreme Court concluded that police officers are required to discontinue a search upon realizing that their warrant is overbroad. *Id.* at 87. But in *Garrison*, the Supreme Court also acknowledged that "while the purposes justifying a police search strictly limit the permissible extent of the search, [we have] also recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Id.* Officers' conduct upon realizing that a warrant is overbroad is therefore reviewed for objective reasonableness. *Id.* at 88.

The undisputed evidence in this case establishes that the defendants' conduct in executing the warrant was objectively reasonable. As discussed in greater detail above, the defendants reasonably believed that they would be searching a single-family home based upon information received from their informant and their own independent investigation. After entering the building and realizing that it was more than a single-family residence, it is undisputed that the defendants limited their search. For instance, officers remained in the ground-floor realty office for only two minutes and only to conduct a security sweep—they never searched the ground-floor offices. After concluding the security sweep, the officers downstairs joined the officers upstairs to assist with the search of the second-floor apartment. Limiting the search to the second-floor apartment was objectively reasonable given what the officers knew: that the confidential informant had seen Estrada enter the building through a ground-floor door, then exit from a door to the second-floor armed with a handgun.

Nevertheless, Guzman contends that once the officers realized that the warrant mistakenly described the building as a single-family residence, they were required to immediately end their search. In support she cites *Jacobs v. City of Chicago,* in which a warrant described a

building as a single-family residence, but in fact that building contained three separate apartments. *See Jacobs,* 215 F.3d at 764, 769. However, the reason the search in *Jacobs* was invalid was that officers could not tell which of the apartments was properly the subject of the warrant and so searched multiple apartments. *Id.* at 769 (the officers "were obligated to cease that search if they could not determine which apartment was properly the subject of the warrant."). In contrast, the defendants here limited their search to the residential apartment on the second floor of the Walton building—the portion for which they had probable cause to believe they would find Estrada—purposely avoiding the separate commercial space on the ground floor.

## II.    False Arrest (Count II)

Guzman's false arrest claim is premised on the defendants' detention of her while executing the search warrant. Specifically, she argues that because the warrant was invalid and the defendants' execution of the warrant was unreasonable, their detention of her during the search was improper. However, as discussed above, the warrant was valid and the officers' search was reasonable. Because the warrant was supported by probable cause and because the defendants' conduct in executing it was objectively reasonable, the officers were entitled to detain Guzman during the search. *See Michigan v. Summers*, 452 U.S. 692 (1981) (a warrant founded on probable cause carries with it the limited authority to detain the occupants at the premises while a proper search is conducted). Accordingly, the defendants are entitled to summary judgment on Guzman's claim of false arrest (Count II).

III.    **State Law Claims**

The court has granted summary judgment on all of the federal claims, and therefore

declines to exercise its supplemental jurisdiction to decide Guzman's remaining state law claims.

*See* 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the reasons stated, the defendants' motion for summary judgment is granted as to

Counts I (illegal search), II (false arrest), III (excessive force), battery (Count IV) and false arrest

under state law (Count V). The court declines to exercise jurisdiction over her remaining state

law claims of willful and wanton conduct (Count VI), respondeat superior (Count VII) and

indemnification (Count VIII), and those claims are dismissed without prejudice. This resolves all

claims against all parties, and so the clerk is directed to terminate this case and remove it from

the court's docket.


ENTER:

DATE: April 8, 2008            _____

                                         Blanche M. Manning
                                         United States District Judge